BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
ALEX J. TRAMONTANO (276666)
**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com
tramontano@whafh.com

*Attorneys for Plaintiff*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| NATHAN C. SILVA, Derivatively on Behalf of Nominal Defendant THE TRADE DESK, INC.,<br><br>              Plaintiff,<br><br>     v.<br><br>JEFF T. GREEN, LAURA SCHENKEIN, LISA J. BUYER, ANDREA L. CUNNINGHAM, KATHRYN E. FALBERG, GOKUL RAJARAM, DAVID B. WELLS, and SAMANTHA JACOBSEN,<br><br>              Defendants,<br><br>     and<br><br>THE TRADE DESK, INC.,<br><br>              Nominal Defendant. | Case No. _____<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Nathan C. Silva ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant The Trade Desk, Inc. ("Trade Desk" or the "Company"), against current and former members of the Company's Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breach of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, conference call transcripts and announcements made by Defendants, filings with the United States Securities and Exchange Commission ("SEC"), press releases published by and regarding Trade Desk, legal filings, news reports, securities analysts' reports about the Company, filings in the securities class action captioned *United Union of Roofers, Waterproofers & Allied Workers Local Union No. 8 WBPA Fund v. The Trade Desk, Inc., et al.*, Case No. 2:25-cv-01396-CAS-DFM (C.D. Cal.) (the "Securities Class Action"), and other publicly available information.

## NATURE OF THE ACTION

1.    This is a shareholder derivative action brought by Plaintiff on behalf of Trade Desk against certain of its officers and members of the Company's Board (the "Individual Defendants")[1] for breaches of their fiduciary duties between at least May

---

[1] Individual Defendants are Jeff T. Green ("Green"), Laura Schenkein ("Schenkein"), Lisa J. Buyer ("Buyer"), Andrea L. Cunningham ("Cunningham"), Kathryn E. Falberg ("Falberg"), Gokul Rajaram ("Rajaram"), David B. Wells ("Wells"), and Samantha Jacobsen ("Jacobsen"). The Individual Defendants, together with Trade Desk, are "Defendants."

1

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

9, 2024 and February 12, 2025, inclusive (the "Relevant Period"), and the federal securities laws, as set forth below.

2.      Trade Desk is a global technology company that offers a self-service, cloud-based ad-buying platform that allows its clients to plan, manage, optimize, and measure data-driven digital advertising campaigns. The Company's platform allows clients to execute integrated campaigns across ad formats and channels, including connected television ("CTV") and other video, display, audio, and native, on a variety of devices, including televisions, streaming devices, mobile devices, computers, and more.

3.      Before the Relevant Period, on June 6, 2023, the Company launched "Kokai," a generative artificial intelligence ("AI") forecasting tool that allows users to more effectively deploy advertising spending. The Company highlighted Kokai as being a "major advancement in programmatic AI" and stated that it provided access to "more than 13 million advertising impressions every second."

4.      After launching Kokai, the Company began to transition its clients from its old platform, Solimar, to Kokai. Defendant Green highlighted the transition to Kokai as the "largest platform overhaul in our company's history." Trade Desk assured investors that the client transition would be "without [] disruption" and that Kokai would be fully rolled out over the course of 2024.

5.      As detailed herein, throughout the Relevant Period, the Individual Defendants repeatedly touted the value of Kokai to the Company and its clients, highlighting the positive impact Kokai would have on the Company's financial prospects.

6.      However, the truth was revealed on February 12, 2025, when the Company issued a press release announcing its financial results for the fourth quarter and full year of 2024 (the "4Q24 Earnings Release"). In the 4Q24 Earnings Release, the Company revealed that Trade Desk's revenue for the fourth quarter of 2024 was

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

$741 million, which was $15 million below the Company's previously provided guidance of $756 million, and $18.8 million below analysts' estimates of $759.8 million. The 4Q24 Earnings Release also revealed that the Company's revenue guidance for the first quarter of 2025 was at least $575 million, which was approximately $6 million lower than analysts' estimates of $581.5 million.

7.      In the earnings call hosted for investors and analysts on the same day (the "4Q24 Earnings Call"), Defendant Green also revealed that the Company had not yet reached a full adoption of Kokai, stating that the Company was "maintaining 2 systems, Solimar and Kokai. This slows us down," that "Kokai rolled out slower than we anticipated," and that "in some cases, the slower Kokai rollout was deliberate."

8.      On this news, Trade Desk's stock price fell $40.31 per share, or nearly 33%, from a closing price of $122.23 per share on February 12, 2025, to a closing price of $81.92 per share on February 13, 2025.

9.      As set forth herein, throughout the Relevant Period the Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct the materially false and/or misleading statements and omissions of material fact to the investing public concerning the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (i) the Company was experiencing significant challenges in rolling out Kokai, including challenges with transitioning clients from Solimar to Kokai; (ii) these execution challenges resulted in the delay of the full rollout of Kokai; (iii) the Company's inability to fully rollout Kokai negatively impacted the Company's business, operations, and financial prospects; and (iv) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

10.     Furthermore, the Individual Defendants breached their fiduciary duties by causing Trade Desk to repurchase its own stock at prices that were artificially

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

inflated due to the foregoing misrepresentations during the Relevant Period.

11.     As a result of the foregoing, the Securities Class Action was filed against the Company and Defendants Green and Schenkein on February 19, 2025 in the United States District Court for the Central District of California.

12.     As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred significant financial losses, including the cost of defending and paying class-wide damages in the Securities Class Action, as well as additional losses, including reputational harm and loss of goodwill.

13.     Moreover, in light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and Defendants' liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Trade Desk's Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Sections 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and SEC Rule 14a-9 promulgated thereunder by the SEC (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5), and Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a)).

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

15. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

16. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

17. In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

18. Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because a substantial portion of the acts and omissions alleged herein, including the dissemination of materially false and misleading information, occurred in this District, Trade Desk is headquartered in this District, Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District, and the Securities Class Action is pending in this District.

## **PARTIES**

*Plaintiff*

19. Plaintiff is, and has been at all relevant times, a continuous shareholder of Trade Desk.

*Nominal Defendant*

20. Nominal Defendant Trade Desk is a Nevada corporation with its principal executive offices located at 42 N. Chestnut Street, Ventura, California 93001. Trade Desk's common stock is traded on the NASDAQ under the ticker symbol "TTD."

*Individual Defendants*

21. Defendant Green is co-founder of the Company and has served as the Company's President and Chief Executive Officer and as Chairman of the Board since

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

November 2009.

22.    Defendant Schenkein has served as Chief Financial Officer ("CFO") of the Company since June 2023.

23.    Defendant Buyer has served as a director of the Company since March 2019 and as Lead Independent Director of the Company since February 2021. Buyer also serves as Chair of the Company's Nominating and Corporate Governance Committee and as a member of the Company's Audit Committee.

24.    Defendant Cunningham has served as a director of the Company since January 2022. Cunningham also serves as a member of the Company's Nominating and Corporate Governance Committee.

25.    Defendant Falberg has served as a director of the Company since August 2016. Falberg also serves as Chair of the Company's Compensation Committee.

26.    Defendant Rajaram has served as a director of the Company since May 2018. Rajaram also serves as a member of the Company's Audit Committee and Compensation Committee.

27.    Defendant Wells has served as a director of the Company since December 2015. Wells also serves as Chair of the Company's Audit Committee and as a member of the Company's Compensation Committee.

28.    Defendant Jacobsen has served as Chief Strategy Officer of the Company since February 2022 and as a director of the Company since January 2024.

### FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

29.    By reason of their positions as officers and/or directors of Trade Desk, and because of their ability to control the business and corporate affairs of Trade Desk, the Individual Defendants owed Trade Desk and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Trade Desk in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

interests of Trade Desk and its shareholders.

30.    Each director and officer of the Company owes to Trade Desk and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

31.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Trade Desk, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

32.    To discharge their duties, the officers and directors of Trade Desk were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

33.    Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Trade Desk, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

34.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

35.    To discharge their duties, the officers and directors of Trade Desk were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Trade Desk were required to, among other things:

(i)    Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of California and the United States, and pursuant to Trade Desk's own Code of Conduct and Ethics (the "Code of Conduct");

(ii)    Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(iii)    Remain informed as to how Trade Desk conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(iv)    Establish and maintain systematic and accurate records and reports of the business and internal affairs of Trade Desk and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

(v)     Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Trade Desk's operations would comply with all applicable laws and Trade Desk's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(vi)     Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(vii)   Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(viii)  Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

36.     Each of the Individual Defendants further owed to Trade Desk and the shareholders the duty of loyalty requiring that each favor Trade Desk's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

37.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Trade Desk and were at all times acting within the course and scope of such agency.

38.     Because of their advisory, executive, managerial, and directorial positions with Trade Desk, each of the Individual Defendants had access to adverse, non-public information about the Company.

39.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

wrongful acts complained of herein, as well as the contents of the various public statements issued by Trade Desk.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

40. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

41. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

42. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company, purposefully, recklessly, or negligently, to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

43. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Trade Desk, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

44. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

wrongdoing, either took direct part in, or substantially assisted the accomplishment of
that wrongdoing, and was or should have been aware of his or her overall contribution
to and furtherance of the wrongdoing.

45.    At all times relevant hereto, each of the Individual Defendants was the
agent of each of the other Individual Defendants and of Trade Desk and at all times
acted within the course and scope of such agency.

## TRADE DESK'S CODE OF CONDUCT

46.    Trade Desk's Code of Conduct applies to "[a]ll directors, officers and
employees (each, a "Covered Party," and collectively, the "Covered Parties") of the
Company and all of its subsidiaries."

47.    With respect to "Conflicts of Interest," the Code of Conduct states, in
part:

> Each Covered Party has an obligation to conduct the Company's business
> in an honest and ethical manner, including the ethical handling of actual
> or apparent conflicts of interest between personal and professional
> relationships.  Any situation that involves, or may reasonably be expected
> to involve, a conflict of interest with the Company, should be disclosed
> promptly to the Company's Chief Financial Officer or General Counsel.

> This Code does not attempt to describe all possible conflicts of interest
> that may develop.  Other common conflicts of interest from which
> Covered Parties must refrain include:

> • Covered Parties may not engage in any conduct or activities that
>   are inconsistent with the Company's best interests or that disrupt or
>   impair the Company's relationship with any person or entity with

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

which the Company has or proposes to enter into a business or contractual relationship.

- Covered Parties may not accept compensation, in any form, for services performed for the Company from any source other than the Company.

- No Covered Party may take up any management or other employment position with, or have any material interest in, any firm or company that is in direct or indirect competition with the Company.

48.    With respect to "Disclosures," the Code of Conduct provides:

The information in the Company's public communications, including all reports and documents filed with or submitted to the SEC, must be full, fair, accurate, timely and understandable.

To ensure the Company meets this standard, all Covered Parties (to the extent they are involved in the Company's disclosure process) are required to maintain familiarity with the disclosure requirements, processes and procedures applicable to the Company commensurate with their duties.    Covered Parties are prohibited from knowingly misrepresenting, omitting or causing others to misrepresent or omit, material facts about the Company to others, including the Company's independent auditors, governmental regulators and self-regulatory organizations.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

49.    In a section titled "Compliance with Laws, Rules and Regulations," the Code of Conduct states:

> The Company is obligated to comply with all applicable laws, rules and regulations.  It is the personal responsibility of each Covered Party to adhere to the standards and restrictions imposed by these laws, rules and regulations in the performance of his or her duties for the Company.
>
> The Chief Executive Officer, Chief Financial Officer and Chief Accounting Officer or Controller (or persons performing similar functions) of the Company are also required to promote compliance by all employees with the Code and to abide by Company standards, policies and procedures.

50.    In a section titled "Reporting, Accountability and Enforcement," the Code of Conduct provides, in relevant part:

> The Company promotes ethical behavior at all times and encourages Covered Parties to talk to supervisors, managers and other appropriate personnel, including officers, the General Counsel, outside counsel for the Company and the Board or the relevant committee thereof, when in doubt about the best course of action in a particular situation.
>
> Covered Parties should promptly report suspected violations of laws, rules, regulations or the Code or any other unethical behavior by any director, officer, employee or anyone purporting to be acting on the Company's behalf to their supervisor, or directly to the Company's Chief

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  Financial Officer or General Counsel. . . .

2

3  **<u>TRADE DESK'S AUDIT COMMITTEE CHARTER</u>**

4      51.    Pursuant to Trade Desk's Audit Committee Charter, the purpose of the

5  Audit Committee is to "oversee the accounting and financial reporting processes of

6  the Company and the audits of the financial statements of the Company."

7      52.    The Audit Committee Charter lays out the following "Duties and

8  Responsibilities" of the Audit Committee:

9

10  *<u>Interaction with the Independent Auditor</u>*

11

12  1.    *Appointment and Oversight.* The Committee is directly responsible

13  for the appointment, compensation, retention and oversight of the work of

14  the independent auditor (including resolution of any disagreements

15  between Company management and the independent auditor regarding

16  financial reporting) and any other registered public accounting firm

17  engaged for the purpose of preparing or issuing an audit report or related

18  work or performing other audit, review or attest services for the Company,

19  and the independent auditor and each such other registered public

20  accounting firm must report directly to the Committee. The Committee,

21  or the Chair of the Committee, must pre-approve any audit and non-audit

22  service provided to the Company by the independent auditor, unless the

23  engagement is entered into pursuant to appropriate preapproval policies

24  established by the Committee or if such service falls within available

25  exceptions under SEC rules.

26

27  2.    *Annual Report on Independence.* The Committee must ensure that

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

the independent auditor prepares and delivers, at least annually, a written statement delineating all relationships between the independent auditor and the Company, must actively engage in a dialogue with the independent auditor with respect to any disclosed relationships or services that, in the view of the Committee, may impact the objectivity and independence of the independent auditor, and, if the Committee determines that further inquiry is advisable, must take appropriate action in response to the independent auditor's report to satisfy itself of the auditor's independence.

*Annual Financial Statements and Annual Audit*

3.      *Audit Problems*. The Committee must discuss with the independent auditor any audit problems or difficulties and management's response.

4.      *Form 10-K Review*. The Committee must review and discuss the annual audited financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

5.      *Audit Committee Report*. The Committee must provide the Company with the report of the Committee with respect to the audited financial statements for inclusion in each of the Company's annual proxy statements.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*Quarterly Financial Statements*

6.    *Form 10-Q Review.* The Committee must review and discuss the quarterly

financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

*Other Duties and Responsibilities*

7.    *Review of Earnings Releases.* The Committee must discuss the Company's

earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies.

8.    *Risk Assessment and Risk Management.* The Committee must discuss the

Company's policies with respect to risk assessment and risk management.

9.    *Complaint Procedures.* The Committee must establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and for the confidential and anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters.

10.    *Reports to the Board of Directors.* The Committee must report

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

regularly to the Board regarding the activities of the Committee.

11.     *Committee Self-Evaluation.* The Committee must periodically perform an evaluation of the performance of the Committee.

12.     *Review of this Charter.* The Committee must annually review and reassess this Charter and submit any recommended changes to the Board for its consideration.

13.     *Review of Related Person Transactions.* The Committee must review all related person transactions as defined by Item 404 of Regulation S-K on an ongoing basis and all such transactions must be approved by the Committee.

14.     *Review of Code of Ethics.* The Committee must, at least annually, consider and discuss with management and the independent auditor the Company's Code of Conduct and Ethics and the procedures in place to enforce the Code of Conduct and Ethics. The Committee must also consider and discuss and, as appropriate, grant requested waivers from the Code of Conduct and Ethics brought to the attention of the Committee, though the Committee may defer any decision with respect to any waiver to the Board.

## SUBSTANTIVE ALLEGATIONS

*Background*

53.     Trade Desk is a global technology company that offers a self-service, cloud-based ad-buying platform that allows its clients to plan, manage, optimize, and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

measure data-driven digital advertising campaigns. The Company's platform allows clients to execute integrated campaigns across ad formats and channels, including CTV and other video, display, audio, and native, on a variety of devices, including televisions, streaming devices, mobile devices, computers, and more.

54.     Before the Relevant Period, on June 6, 2023, the Company launched Kokai, a generative AI forecasting tool that allows users to more effectively deploy advertising spending. In the press release announcing the launch of Kokai, Trade Desk stated that Kokai's capabilities included "predictive clearing, which ensures traders make bids at the optimal level; scoring every ad impression based on relevance to the advertiser; upgrading measurement and forecasting; increasing resilience, even in the absence of identifiers; budget optimization; and KPI [key performance indicator] scoring."[2]

55.     In this press release, the Company highlighted Kokai as being a "major advancement in programmatic AI" and stated that it provided access to "more than 13 million advertising impressions every second."

56.     After launching Kokai, the Company began to rollout Kokai, transitioning its clients from its old platform, Solimar, to Kokai. Defendant Green highlighted the transition to Kokai as the "largest platform overhaul in our company's history." The Company also assured investors that the client transition would be "without [] disruption" and that Kokai would be fully rolled out over the course of 2024.

57.     As detailed herein, throughout the Relevant Period, the Individual Defendants repeatedly touted the value of Kokai to the Company and its clients,

---

[2] *See The Trade Desk Launches Kokai – A New Media Buying Platform That Brings the Full Power of AI to Digital Marketing*, The Trade Desk, Inc. (June 6, 2023), https://www.thetradedesk.com/us/news/press-room/the-trade-desk-launches-kokai-a-new-media-buying-platform-that-brings-the-full-power-of-ai-to-digital-marketing.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

highlighting the positive impact Kokai would have on the Company's financial prospects.

***The Individual Defendants' False and Misleading Statements***

58.    On May 8, 2024, after the markets closed, Trade Desk issued a press release announcing its financial results for the first quarter of 2024 (the "1Q24 Earnings Release"). In the 1Q24 Earnings Release, the Company reported revenue of $491 million for the first quarter, representing growth of 28% year-over-year. In the 1Q24 Earnings Release, Defendant Green was quoted as stating:

> Q1 was a strong quarter for The Trade Desk as we delivered revenue of $491 million, accelerating growth to 28% year-over-year. Our outstanding performance to start the year underlines the value advertisers are placing on premium inventory on the open internet[.] With the continued strong growth of CTV, the growing ubiquity of UID2, new approaches to authentication, greater deployment of first-party data and retail data, and with significant AI advances in our Kokai platform, we are better positioned than ever to deliver premium value to advertisers and continue to gain market share.

59.    On the same day, Trade Desk hosted an earnings call for investors and analysts to discuss the financial results for the first quarter of 2024 ("1Q24 Earnings Call"). During the 1Q24 Earnings Call, Defendant Green attributed the Company's revenue growth to the rollout of Kokai, stating, in relevant part, "I believe our revenue growth acceleration in the first quarter speaks to the innovation and value that we are delivering to our clients with Kokai." Defendant Green went on to highlight Kokai's capabilities, stating, in relevant part:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

[A]nd the innovations in our Kokai platform will help our clients take advantage of this revaluation and fully leverage data-driven buying to fuel their own business growth. As a result, I've never been more optimistic about the future of the open Internet and our ability to gain more than our fair share of the nearly $1 trillion advertising TAM [total addressable market].

60.    During the 1Q24 Earnings Call, Defendant Schenkein also highlighted Kokai's role in the Company's growth, stating, in relevant part "All of our progress in areas such as CTV, Retail Media, *Kokai* and UID2 helped deliver another quarter of consistently strong growth and profitability to start 2024." (Emphasis added).

61.    On August 8, 2024, the Company issued a press release announcing its financial results for the second quarter of 2024 (the "2Q24 Earnings Release"). In the 2Q24 Earnings Release, Trade Desk reported revenue of $585 million for the second quarter of 2024, representing a 26% increase year-over-year. Defendant Green was quoted in the 2Q24 Earnings Release as stating, in relevant part:

We've made significant strides in CTV, retail media and identity, empowering the world's largest brands to buy premium media on the open internet with unprecedented agility and precision. As Kokai ramps, we're intuitively surfacing value for advertisers, integrating data into every decision, advancing the full power of AI as a co-pilot, and enabling advertisers to maximize the potential of their first party data. With ongoing innovations in Kokai, the widespread adoption of UID2, and the expanding use of retail data, we will continue to deliver exceptional value to advertisers and grow our leadership in key high growth markets such as CTV.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

62.    On the same day, the Company hosted an earnings call for investors and analysts to discuss its financial results for the second quarter of 2024 (the "2Q24 Earnings Call"). During the 2Q24 Earnings Call, Defendant Green touted Kokai's functionality, stating, in relevant part:

In order to help advertisers think about efficacy in new ways and to help them take advantage of the premium open Internet where consumers are most leaned in, *after years of development, we launched our most ambitious platform to date, Kokai*. Kokai allows our clients to deploy data about their most loyal customers and then use that data as a seed to grow and harvest the next generation of loyal customers. Kokai helps them target those new audiences across the many thousands of destinations that comprise the best of the open Internet.

And it leverages AI to help them make sense of the roughly 15 million ad opportunities we see every second and the hundreds of variables associated with each one of them. And all of this happens in the context of what any given client's unique business growth goals are. *I've been incredibly encouraged by the early results from Kokai.* For those campaigns that have moved from Solimar to Kokai in aggregate, incremental reach is up more than 70%.

Cost per acquisition has improved by about 27% as data elements per impression have gone up by about 30%. In addition, performance metrics have improved by about 25%, helping to unlock performance budgets on our platform for years to come. So, our clients are getting more precise, more cost-efficient, and then they're able to reinvest for even more reach

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

and drive a much better return on ad spend. Given everything I said about what CMOs [chief marketing officers] today are trying to accomplish and the pressures that they are under, ***I firmly believe that we have met the moment with Kokai.***

(Emphasis added).

63.    On October 3, 2024, the Company filed a proxy statement on a Schedule 14A with the SEC (the "October 2024 Proxy"). The October 2024 Proxy highlighted Kokai's contribution to the Company's success, stating, in relevant part:

Our success as a company would not have been possible without the foresight and strategic decisions of our visionary founder, Chief Executive Officer and controlling stockholder, Jeff Green. Mr. Green has become a thought leader for our industry, and has consistently guided the Company by successfully anticipating industry trends and changes and developing our strategy and products to take advantage of those opportunities. . . .Some of our strategic decisions in recent years have included, among others. . . .

In 2023, we announced the launch of Kokai, our largest core platform overhaul to date that took over a year to develop. With advances in AI infused across the platform, Kokai helps marketers optimize ad campaigns across all channels by focusing on audiences first – using data about their most loyal customers to find and build new customer relationships. With Mr. Green's vision for Kokai, we are helping programmatic traders rethink how they approach digital ad campaigns, optimizing the value of their campaign dollars.

64.     On November 7, 2024, the Company issued a press release announcing its financial results for the third quarter of 2024 (the "3Q24 Earnings Release"). The 3Q24 Earnings Release revealed that the Company had revenue of $628 million for the third quarter of 2024, representing accelerated growth of 27%. The 3Q24 Earnings Release also provided fourth quarter revenue guidance of $756 million. Defendant Green was quoted in the 3Q24 Earnings Release as stating:

> The Trade Desk delivered strong performance in the third quarter, with revenue of $628 million, accelerating growth to 27%. This performance underlines the value that advertisers are placing on precision and transparency as they work with us to maximize the impact of their campaigns[.] ***As we enter our busiest time of year and look ahead to 2025, we have never been in a better position to capture greater share of the $1 trillion advertising TAM***. 2024 has been a banner year for CTV. Many of the largest media companies are now working with us to help clients capture the full value of CTV advertising via programmatic. We are similarly excited about the momentum in retail media and the pace of adoption by advertisers who are taking advantage of our retail data marketplace. ***And the performance improvements that our clients are seeing with Kokai - our largest platform upgrade to date - showcase the value of audience-driven, AI-enabled innovation***.

(Emphasis added).

65.     On the same day, the Company hosted an earnings call for investors and analysts to discuss its financial results for the third quarter of 2024 (the "3Q24 Earnings Call"). During the 3Q24 Earnings Call, Defendant Green assured investors that Kokai was performing well, stating, "[w]e are already seeing the results of Kokai

performance today, but we're just getting started." Defendant Schenkein also touted Kokai's role in the Company's growth during the 3Q24 Earnings Call, stating, in relevant part, "[k]ey investment initiatives, including performance advancements in our Kokai platform . . . are not only strengthening our foundation, but position us for durable growth in 2025 and beyond."

66.     During the questions and answer portion of the 3Q24 Earnings Call, an analyst asked Defendant Green "I guess what type of work does it take to help CMOs and the users understand the metrics coming out of Kokai but also to kind of gain trust around them? I know that's been a challenge in some other walled garden platforms, so people trusting the attribution data." In response, Defendant Green stated, in relevant part:

I really appreciate the question because ***I think this is one of the more nuanced ways that we have just so much opportunity in front of us***. . . .

But the state of measurement is that walled gardens have essentially been grading their own homework for many, many years. And one of the things that they've done really well is convinced people to use their own metrics and kept things quite simple. But at times, that's been really difficult for some of the biggest brands in the world because they'll be told by a walled garden, we help you sell 101 toothbrushes, when the company actually only sold 100 toothbrushes total. So, when you have that phenomenon, you start to doubt the credibility of those metrics.

We have a very different dilemma or challenge, which is that we've been sharing so much data with them and given them so many options about the way to attribute success and attribute sales we've overwhelmed them

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

with complexity and with numbers and there are so many different ways for us to answer those questions. . . .

So, ***I'm very optimistic about what that means for the future*** because I do think there is a very important principle that we have been saying since the day we went public, which is objectivity matters a lot today, but it will matter more tomorrow, and it will matter more the day after that. ***And as time marches on, we think that that continues to be one of our greatest strategic advantages over the biggest names in tech.***

(Emphasis added).

67.    The statements detailed above were materially false and misleading when made because they failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (i) the Company was experiencing significant challenges in rolling out Kokai, including challenges with transitioning clients from Solimar to Kokai; (ii) these execution challenges resulted in the delay of the full rollout of Kokai; (iii) the Company's inability to fully rollout Kokai negatively impacted the Company's business, operations, and financial prospects; and (iv) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

***The Truth Emerges***

68.    The truth was revealed on February 12, 2025, when the Company issued the 4Q24 Earnings Release. In the 4Q24 Earnings Release, the Company revealed that Trade Desk's revenue for the fourth quarter of 2024 was $741 million, which was $15 million below the Company's previously provided guidance of $756 million, and

$18.8 million below analysts' estimates of $759.8 million. The 4Q24 Earnings Release also revealed that the Company's revenue guidance for the first quarter of 2025 was at least $575 million, which was approximately $6 million below analysts' estimates of $581.5 million.

69.    On the same day, during the 4Q24 Earnings Call, Defendant Green revealed that the Company had not yet reached a full adoption of Kokai, stating that while the Company was moving 100% of its clients over to Kokai, that "today, [the Company is] maintaining 2 systems, Solimar and Kokai." Defendant Green stated that maintaining the two systems "slows us down."

70.    Additionally, during the questions and answers section of the 4Q24 Earnings Call, Defendant Green revealed that "Kokai rolled out slower than we anticipated," and that "in some cases, the slower Kokai rollout was deliberate."

71.    On this news, Trade Desk's stock price fell $40.31 per share, or nearly 33%, from a closing price of $122.23 per share on February 12, 2025, to a closing price of $81.92 per share on February 13, 2025.

**Insider Sales**

72.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendants Green, Schenkein, Rajaram, Cunningham, and Jacobson sold substantial portions of Company common stock while in possession of non-public information concerning the Company's financial condition and business prospects.

73.    While the Company's stock price was artificially inflated, Defendant Green sold approximately 1.5 million shares of Trade Desk common stock, totaling proceeds of approximately $166,019,977.22. Defendant Green made the following sales of Trade Desk stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction |
|---|---|---|---|
| 8/22/2024 | 135,922 | $103.72 | $14,097,829.84 |
| 8/26/2024 | 283,429 | $104.20 | $29,533,301.80 |
| 9/20/2024 | 200,000 | $109.47 | $21,894,000 |
| 9/23/2024 | 200,000 | $108.68 | $21,736,000 |
| 9/25/2024 | 200,000 | $110.54 | $22,108,000 |
| 10/4/2024 | 200,000 | $112.96 | $22,592,000 |
| 10/7/2024 | 200,000 | $112.30 | $22,460,000 |
| 10/9/2024 | 80,649 | $115.50 | $9,314,959.50 |
| 1/7/2025 | 18,207 | $125.44 | $2,283,886.08 |

74. While the Company's stock price was artificially inflated, Defendant Schenkein sold approximately 96,835 shares of Trade Desk common stock, totaling proceeds of approximately $9,875,985.80. Defendant Schenkein made the following sales of Trade Desk stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction |
|---|---|---|---|
| 6/14/2024 | 43,705 | $95.38 | $4,168,582.90 |
| 7/9/2024 | 25,000 | $100.43 | $2,510,750 |
| 8/16/2024 | 3,130 | $99.33 | $310,902.90 |
| 10/9/2024 | 25,000 | $115.43 | $2,885,750 |

75. While the Company's stock price was artificially inflated, Defendant Rajaram sold approximately 6,480 shares of Trade Desk common stock, totaling proceeds of approximately $677,204.10. Defendant Rajaram made the following sales of Trade Desk stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction |
|---|---|---|---|
| 6/21/2024 | 2,415 | $97.92 | $236,476.80 |
| 7/22/2024 | 1,355 | $98.37 | $133,291.35 |
| 9/24/2024 | 1,355 | $109.00 | $147,695 |
| 10/21/2024 | 1,355 | $117.89 | $159,740.95 |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

76.    While the Company's stock price was artificially inflated, Defendant Cunningham sold approximately 1,606 shares of Trade Desk common stock, totaling proceeds of approximately $160,712.42. Defendant Cunningham made the following sales of Trade Desk stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction |
|---|---|---|---|
| 8/15/2024 | 1,606 | $100.07 | $160,712.42 |

77.    While the Company's stock price was artificially inflated, Defendant Jacobson sold approximately 9,170 shares of Trade Desk common stock, totaling proceeds of approximately $994,334.88. Defendant Jacobson made the following sales of Trade Desk stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction |
|---|---|---|---|
| 8/16/2024 | 4,872 | $99.50 | $484,764 |
| 1/28/2025 | 4,298 | $118.56 | $509,570.88 |

78.    In total, during the Relevant Period, these five Individual Defendants' lucrative insider sales netted proceeds of approximately $177.7 million.

79.    As a result of these insider sales, Defendants Green, Schenkein, Rajaram, Cunningham, and Jacobson were unjustly enriched.

***Stock Repurchases During the Relevant Period***

80.    According to the Company's public filings, while the price of Company stock was artificially inflated due to the false and misleading statements detailed above, the Individual Defendants caused the Company to repurchase approximately 978,000 shares of its own stock, for a total of approximately $110,491,950 million during the Relevant Period.

81.    According to the Company's public filings, Trade Desk made the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

following repurchases of its own stock during the Relevant Period:

| Dates of Stock Repurchase | Number of Shares Repurchased | Average Price Per Share on Date of Repurchase | Total Cost of Repurchase |
|---|---|---|---|
| August 1, 2024 to August 31, 2024 | 117,000 | $103.74 | $12,137,580 |
| September 1, 2024 to September 30, 2024 | 400,000 | $104.39 | $41,756,000 |
| October 1, 2024 to October 31, 2024 | 214,000 | $115.26 | $24,665,640 |
| November 1, 2024 to November 30, 2024 | 38,000 | $128.91 | $4,898,580 |
| December 1, 2024 to December 31, 2024 | 209,000 | $129.35 | $27,034,150 |

82.    Given that the price of Trade Desk stock was $81.92 per share on February 13, 2025, after the corrective disclosures, the true value of the 978,000 repurchased shares was roughly $80,117,760 million. Accordingly, the Individual Defendants caused the Company to overpay by approximately $30.3 million to repurchase these shares during the Relevant Period.

***Harm to the Company***

83.    As a direct and proximate result of the Individual Defendants' misconduct, Trade Desk has lost and expended, and will lose and expend, millions of dollars.

84.    Such expenditures include, but are not limited to, the legal fees associated with the Securities Class Action filed against the Company and Defendants Green and Schenkein, and amounts paid to outside lawyers, accountants, and investigators in connection therewith.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

85.    Such expenditures also include, but are not limited to, significant compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

86.    Furthermore, the Securities Class Action has exposed the Company to massive class-wide liability.

87.    Additionally, during the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company.

## **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

88.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breach of fiduciary duties by the Individual Defendants.

89.    Trade Desk is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

90.    Plaintiff is a current shareholder of Trade Desk and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

91.    A pre-suit demand on the Board of Trade Desk is futile and, therefore, excused. At the time this action was commenced, the eight-member Board was comprised of Defendants Green, Buyer, Cunningham, Falberg, Rajaram, Wells, and Jacobson (the "Director Defendants"), as well as non-party Alex Kayyal ("Kayyal," and together with the Director Defendants, the "Directors"). Accordingly, Plaintiff is only required to show that four Directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Director Defendants are incapable of making an

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

92.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

93.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

94.    Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

95.    Defendant Green is not disinterested or independent and is therefore incapable of considering a demand. Green is co-founder of the Company and serves as the Company's President and CEO. Thus, as conceded by Trade Desk in its annual proxy statement filed with the SEC on April 12, 2024 (the "2024 Proxy"), the Company admits that Defendant Green is a non-independent director. Furthermore, Defendant Green is named as a defendant, and therefore faces significant personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period.

96.    Defendant Jacobson is not disinterested or independent and is therefore incapable of considering a demand. Jacobson serves as Chief Strategy Officer of the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Company. Thus, as conceded by Trade Desk in the 2024 Proxy, Defendant Jacobson is a non-independent director.

97.    Defendants Buyer, Rajaram, and Wells served on the Company's Audit Committee during the Relevant Period (the "Audit Defendants") and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial accounting and reporting, the underlying internal controls and procedures over financial reporting, and the audits of the financial statements. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business and the adequacy of its internal controls as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

98.    The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Directors to also adhere to the Company's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

99.    All of the Board's current members derive substantial revenue from the Company, control the Company, and are indebted to each other. These conflicts of interest have precluded the Board's current members from calling into question the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Director Defendants' conduct.

100. Moreover, none of the Director Defendants have taken remedial action to redress the conduct alleged herein.

101. The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

102. Additionally, Defendants Green, Buyer, Cunningham, Falberg, Rajaram, Wells, and Jacobson solicited the October 2024 Proxy.

103. Furthermore, Individual Defendants Green, Schenkein, Rajaram, Cunningham, and Jacobson have received material personal benefits from their insider sales as a result of the Individual Defendants' false and misleading statements alleged herein.

104. The acts complained of herein constitute violations of fiduciary duties owed by Trade Desk's officers and directors, and these acts are incapable of ratification.

105. Thus, for all of the reasons set forth above, the Director Defendants are unable to consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

/ / /

/ / /

/ / /

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## **COUNT I**

**Against the Individual Defendants for Violations of Section 14(a)**

**of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a-9 (17 C.F.R. § 240.14a-9)**

106. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

107. The Individual Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

108. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that:

It shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l].

109. Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

110. The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the October 2024 Proxy filed with the SEC. As alleged above, this filing contained

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

materially false and misleading statements concerning the value of Kokai to the Company. Specifically, the October 2024 Proxy was materially false and misleading because it failed to disclose, *inter alia*: (i) the Company was experiencing significant challenges in rolling out Kokai, including challenges with transitioning clients from Solimar to Kokai; (ii) these execution challenges resulted in the delay of the full rollout of Kokai; (iii) the Company's inability to fully rollout Kokai negatively impacted the Company's business, operations, and financial prospects; and (iv) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

111.   The misrepresentations and omissions in the October 2024 Proxy were material to Company stockholders in voting on the matters set forth for stockholder determination in the October 2024 Proxy, including, but not limited to, the approval of the reincorporation of Trade Desk from the State of Delaware to the State of Nevada by conversion.

112.   The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the October 2024 Proxy.

113.   As a result of the Individual Defendants' material misrepresentations and omissions, the Company has sustained significant damages.

114.   Plaintiff, on behalf of the Company, has no adequate remedy at law

## COUNT II

**Against the Individual Defendants for Violations of Section 10(b) of**

**the Exchange Act (15 U.S.C. § 78(j)) and Rule 10b-5 (17 C.F.R. § 240.10b-5)**

115.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

116.   The Individual Defendants participated in a scheme with the purpose and effect of defrauding Trade Desk. Not only is Trade Desk now defending claims that it

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Trade Desk by the Individual Defendants.

117.   During the Relevant Period, while the price of the Company's stock was artificially inflated as a result of the false and misleading statements issued, the Individual Defendants caused the Company to overpay by approximately $30.3 million to repurchase approximately 978,000 shares of Trade Desk common stock.

118.   The Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements, and periodic and current reports filed with the SEC.

119.   The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Trade Desk not misleading.

120.   The Individual Defendants, as directors and officers of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Trade Desk.

121.   The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

122.    The Individual Defendants, through their violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, have caused the Company to expend over $110 million in the repurchase of Trade Desk stock at artificially inflated prices and have exposed the Company to millions of dollars in potential class-wide damages in the Securities Class Action.

123.    By virtue of the foregoing, the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

124.    Plaintiff, on behalf of Trade Desk, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Violations
### of Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a))

125.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

126.    The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act. By virtue of their positions of control within the Company, the Individual Defendants had the authority to cause the Company to issue materially false and misleading statements, and to repurchase Trade Desk stock at prices artificially inflated by those materially false and misleading statements.

127.    Plaintiff, on behalf of Trade Desk, has no adequate remedy at law

/ / /

/ / /

/ / /

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

**COUNT IV**

2

**Against the Individual Defendants**

3

**For Breach of Fiduciary Duty**

4     128.    Plaintiff incorporates by reference and realleges each and every

5 allegation contained above, as though fully set forth herein.

6     129.    The Individual Defendants owed the Company fiduciary obligations. By

7 reason of their fiduciary relationships, the Individual Defendants owed the Company

8 the highest obligation of good faith, fair dealing, loyalty, and due care.

9     130.    The Individual Defendants violated and breached their fiduciary duties

10 of care, loyalty, reasonable inquiry, and good faith.

11     131.    The Individual Defendants engaged in a sustained and systematic failure

12 to properly exercise their fiduciary duties. Among other things, the Individual

13 Defendants breached their fiduciary duties of loyalty and good faith by failing to

14 implement and monitor adequate internal controls over the Company's financial

15 reporting and, as a consequence, issuing or permitting the issuance of materially false

16 and misleading statements in the Company's SEC filings and other public disclosures.

17 These actions could not have been a good faith exercise of prudent business judgment

18 to protect and promote the Company's corporate interests.

19     132.    Specifically, the Individual Defendants willfully or recklessly made

20 and/or caused the Company to make false and/or misleading statements and omissions

21 of material fact that failed to disclose, *inter alia,* that: (i) the Company was

22 experiencing significant challenges in rolling out Kokai, including challenges with

23 transitioning clients from Solimar to Kokai; (ii) these execution challenges resulted in

24 the delay of the full rollout of Kokai; (iii) the Company's inability to fully rollout

25 Kokai negatively impacted the Company's business, operations, and financial

26 prospects; and (iv) as a result of the foregoing, the Company's public statements

27 regarding its business, operations, and prospects were materially false and misleading

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

and/or lacked a reasonable basis at all relevant times.

133.   In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced herein.

134.   Moreover, in further breach of their fiduciary duties during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices before the fraud was exposed.

135.   Furthermore, five of the Individual Defendants engaged in insider sales during the Relevant Period while the price of the stock was artificially inflated, netting millions of dollars in proceeds for themselves.

136.   The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

137.   As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

138.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

resulting in an increased cost of capital, and reputational harm.

139.   Plaintiff, on behalf of Trade Desk, has no adequate remedy at law.

## COUNT V

### Against the Individual Defendants for Aiding and
### Abetting Breach of Fiduciary Duty

140.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

141.   By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breach of their fiduciary duties.  In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

142.   Plaintiff, on behalf of Trade Desk, has no adequate remedy at law.

## COUNT VI

### Against the Individual Defendants
### For Unjust Enrichment

143.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

144.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Trade Desk.

145.   The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Trade Desk that were tied to the performance or artificially inflated valuation of Trade

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Desk, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

146.   Plaintiff, as a shareholder and a representative of Trade Desk, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

147.   Plaintiff, on behalf of Trade Desk, has no adequate remedy at law.

## COUNT VII

### Against the Individual Defendants

### For Abuse of Control

148.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

149.   The Individual Defendants misconduct alleged herein constituted an abuse of their control over the Company, for which they are legally liable.

150.   As a direct and proximate cause of the Individual Defendants' abuse of control, the Company has sustained substantial damages.

151.   Plaintiff, on behalf of Trade Desk, has no adequate remedy at law.

## COUNT VIII

### Against the Individual Defendants

### For Waste of Corporate Assets

152.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

153.   The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

154.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses; (ii) causing the Company to repurchase over 900,000 shares of its own common stock at artificially inflated prices; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Securities Class Action.

155.    Additionally, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

156.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

157.    Plaintiff, on behalf Trade Desk, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.    Awarding punitive damages;

D.    Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

## JURY DEMAND

2        Plaintiff hereby demands a trial by jury.

3   Dated: March 6, 2025                    **WOLF HALDENSTEIN ADLER**
                                            **FREEMAN & HERZ LLP**
4

5                                    By:    */s/ Alex J. Tramontano*
                                            ALEX J. TRAMONTANO
6
                                            Betsy C. Manifold (182450)
7                                           Rachele R. Byrd (190634)
                                            Alex J. Tramontano (276666)
8                                           750 B Street, Suite 1820
                                            San Diego, CA 92101
9                                           Telephone: (619) 239-4599
                                            Facsimile: (619) 234-4599
10                                          Email: manifold@whafh.com
                                            Email: byrd@whafh.com
11                                          Email: tramontano@whafh.com

12                                          **RIGRODSKY LAW, P.A.**
                                            Seth D. Rigrodsky
13                                          Vincent A. Licata
                                            Leah B. Wihtelin
14                                          825 East Gate Boulevard, Suite 300
                                            Garden City, NY 11530
15                                          Telephone: (516) 683-3516
                                            Email: sdr@rl-legal.com
16                                          Email: va@rl-legal.com
                                            Email: lw@rl-legal.com
17
                                            **GRABAR LAW OFFICE**
18                                          Joshua H. Grabar
                                            One Liberty Place
19                                          1650 Market Street, Suite 3600
                                            Philadelphia, PA 19103
20                                          Telephone: 267-507-6085
                                            Email: jgrabar@grabarlaw.com
21
                                            *Attorneys for Plaintiff*
22

23

24

25

26

27

28
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## **VERIFICATION**

I, Nathan C. Silva, have reviewed the allegations made in this Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I further declare that I am a current holder, and have been a holder, of The Trade Desk, Inc. common stock at all relevant times.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this _____ day of _____ 2025.

3/3/2025

DocuSigned by:

_Nathan Silva_

Nathan C. Silva